## THE L-1.

### UNITED STATES v. PILOTS' ASS'N FOR BAY AND RIVER DELAWARE.
### No. 289.

District Court, E. D. Pennsylvania.
March 12, 1929.

Mark Thatcher, Asst. U. S. Atty., of Philadelphia, Pa., J. Frank Staley, Spec. Asst. Atty. Gen., of Washington, D. C., and G. W. Coles, U. S. Atty., of Philadelphia, Pa., for libelants.

Otto Wolff, Jr., and Lewis, Adler & Laws, all of Philadelphia, Pa., for respondents.

KIRKPATRICK, District Judge.

This is a suit arising out of a collision between the pilot boat Philadelphia, owned by the defendant, and the submarine L-1, a vessel of the United States Navy. The collision occurred at about 2:50 a. m. on the morning of February 2, 1921, in the inland waters of Delaware Bay, at a point about four miles in a northwesterly direction from the Overfalls lightship; weather, clear; sky, overcast; wind, northeast; tide, flood.

It will appear that the issue presented by the case depends entirely upon the answer to the single question of fact; Was the port light of the submarine showing red or white at the time of the collision?

The simplest way to approach the case is by taking first the version of the pilot boat, which is practically all contained in the testimony of Bennett, a pilot who was on board, awaiting his turn to go upon a ship. If this version is a true account of what happened, it will follow that the submarine was wholly at fault. The facts testified to by Bennett are as follows: Shortly after 2 o'clock he went on watch in the pilot house of the pilot boat. At the time the pilot boat was not under way, but lying dead in the water at a point something more than two miles inside the Overfalls lightship. The pilot boat was heading southeast by south, and the lightship bore a point off her port bow, and about southeast. A few minutes after he went on watch, Bennett observed a faint white light a point and a half or two points on his starboard bow. Shortly after, he saw another white light close to the first. The two lights appeared to him to be the range lights of a vessel. The lower of the two lights was to his right, and he concluded from that fact that the vessel was showing her starboard side, and was steering in a direction which would cause her to pass the pilot to the latter's starboard. From the fact that he was unable to see any side lights, he concluded that the vessel was at least two miles away.

He further thought that it was a steamer coming in, and that it would require a pilot. Going below, he called Chambers (now deceased), who was the pilot who was next in turn for pilot duty, and returned immediately to the pilot house.

He then signaled the engine room to start the vessel ahead slow, which was done, making about six knots. At the same time he told the wheelsman to keep the approaching lights a point or a point and a half on his starboard bow, which orders were also complied with. Bennett then called Capt. Kelly, the commander of the pilot boat, who up to that time had been in his cabin just aft of the pilot house. No further orders were given, but the pilot boat proceeded at about six knots, keeping the lights a point to a point and a half on the starboard bow. A few minutes after she started a faint green light appeared close to the two white lights. This confirmed the conclusion in Bennett's mind that the approaching vessel was showing her starboard side, and also that she was at a considerable distance, at least a mile and a half away. The pilot boat continued on her course, and, not more than two minutes later, struck the hull of the submarine, whose lights were the lights which had been observed, almost at right angles, at a point some twenty to thirty feet aft of the submarine's bridge.

After the collision, Bennett observed the lights of the submarine as she lay near the pilot boat. She carried three navigation lights, one (called the masthead light) located high up on the forward part of the superstructure. The side lights were on either side of the superstructure, about two feet behind the masthead light, and two or three feet below it. The starboard side light showed green. The port side light, instead of showing red, showed white. Thus, any one observing the submarine at a distance from any point on her port bow saw two white lights—the masthead light and the portside light which would be below it and to the right. If the latter light showed white, the lights might easily be mistaken for the starboard view of the range lights of an approaching vessel. The apparent absence of any side light would give the further impression that the vessel was at a considerable distance away, because the observer would expect to see a green starboard light show up if the vessel had come within a distance of two miles. According to the version of the pilot boat, therefore, the mistake on its part, arising from the improper showing of a white light instead of a red one on the port side of the submarine, was the cause of the accident. If the version above given is the correct story of what happened, then I can find no fault on the part of the pilot boat.

The libelant's case against the pilot boat consists of two charges of fault; first, that the pilot boat kept a constant bearing upon lights which she knew to be the lights of an approaching vessel. This, the libelant says, is a course which must inevitably lead to a collision. The libelant's case in this particular, however, depends entirely upon the port light of the submarine showing red. If it showed white, and the pilot boat saw no side lights, then she was justified in believing that the approaching vessel was a long distance away. She assumed it was an incoming vessel that wanted a pilot. Naturally she would direct her course towards her until she came very much closer than two miles. Certainly no negligence can be imputed to a pilot boat wishing to tender its services, from an order to maintain, for a time, a constant bearing upon the lights of an approaching vessel, which, upon reasonable and proper grounds, appears to be more than two miles away.

As to the libelant's other charge of fault, it may or may not be true that the pilot boat failed to maintain a proper sea watch, and that she was actually not directed by a properly licensed navigating officer, but, if the lights of the submarine were as Bennett says they were, then the pilot boat was properly navigated, and, so far as this case is concerned, it makes no difference by whom. Even if the libelant's charge is properly grounded, neither the lookout nor the navigator of the pilot boat were at fault or in any way responsible for the collision.

It will thus be seen, as stated above, that the whole case comes down to the question of whether the port light of the submarine was showing red or white. There is the usual balance of testimony in this case, but it is particularly difficult of solution because of the general favorable impression made upon the court by the witnesses on both sides. The direct testimonial evidence to the fact may be briefly summarized. Lieutenant Cochran, the navigating officer in charge of the submarine at the time of the collision, testified that, before the collision, he observed the port light of the submarine (in fact could not help observing it because of the small size of the bridge and the close proximity to the light in which he stood), and that it showed a perfectly normal red color. Lieutenant Commander Luker, the commanding officer of the

submarine, who was below at the time of the collision, testified that he observed the light several times when on watch two hours before, that there was no sign whatever of any paint having peeled off, and that it was a distinctive red. Commander Gibson who was sent down from the Navy Yard the evening of the day following the collision, and who had no connection with the submarine, testified that his attention was particularly called to the lights by the unusual fact that they were burning after the vessel had been beached, and that the port light showed a distinct red.

On the other hand, after the collision, a skiff put off from the pilot boat and rowed over close to the port side of the submarine to see whether she required aid. All of the men in the skiff, Backin, Marshall, Jr., and Evans, testified that the light showed white. These were all the members of the crew of the skiff who were available as witnesses. In addition to these, Bennett testified as above. Evans, who had been acting as lookout, said that the lights he saw were two white lights, both before and after the collision. However, he observed that the port light had a little red tinge around the edge. From the deck of the pilot boat after the collision, Marshall, Sr., saw that the port light showed white. Lyons testified that it did not show a particle of red. E. C. Marshall, another pilot, testified that it was a white light, and showed no trace of red whatever.

All the witnesses mentioned above were interested to a greater or less extent, with the exception of Gibson, who has no interest in the case. He is a naval officer, and had a slight acquaintance with Cochran.

To impeach the testimony of the witnesses for the pilot boat, the libelant offered the report of the master of the pilot boat filed by requirement of law within two or three days of the collision in which no mention is made of any defective port light upon the submarine, but which merely stated that, "when the vessels were getting very close together, the submarine, without any warning, proceeded directly across our bow." To this the pilot boat replies, first, that Capt. Kelly is dead, and may have had an explanation which cannot now be known; second, that there is no requirement of law that the *cause* of the collision be stated in the report; and, third, that in the newspaper report (testified to by Gibson), published about a day after the disaster, it appears that the pilot boat charged the submarine with responsibility because her port light showed white.

To impeach the testimony of the witness Cochran for the submarine, the respondents point to the testimony of Backin, to the effect that, as he lay in the skiff alongside the submarine, he called Cochran's attention to the fact that the port light showed white, and that Cochran made no reply. This conversation is denied by both Cochran and Luker (who had come up on the bridge), and was not heard by Marshall, Jr., who was also in the skiff. Evans, the lookout, went to the submarine in the skiff, and corroborates. Backin as to the conversation with Cochran. For the same purpose, the respondents also offer the testimony of E. C. Marshall to a conversation on the pilot boat after he had towed the submarine into the breakwater, in the course of which Cochran was asked by both Kelly and the witnesses what the matter was with his red light, and he smiled and said, "I got nothing to say about that." Cochran denies that this conversation took place.

Three more remote pieces of circumstantial evidence were offered which have an important bearing upon the issue.

(a) It is undisputed that, a little more than two weeks before the collision, the lens from the port light was removed and freshly painted red.

(b) It is also undisputed that the newly painted lens, when replaced, was cracked, and that on her voyage from Hampton Roads to Delaware Bay the submarine encountered some sea. To an interrogatory the libelant answered that such sea "may have affected the red paint of the port lens." Commander Luker testified that, if the vessel was submerged, the water probably would get in, but he did not think rain would have any effect upon it.

(c) It is also undisputed that on February 18, the submarine being then in the Philadelphia Navy Yard, much of the red paint had disappeared from the port light. Gibson said that the light showed practically white. Sergeant, a government inspector for the Department of Commerce, thought he could see red at the edges, but any light reflected through it would show white. Luker thought that the light was a faded red. The libelant did not dispute this condition, but undertook to explain it by showing that, during the salvage operations at the breakwater, steam lines were run to the pumps through the conning tower hatch, passing close to the port running light, and that it was subjected to heat, steam, and moisture for several days. In the opinion of Luker this could have caused the paint to peel or flake off. Op-

posing this opinion is the fact that the light in question consisted of a solid bronze casting or box fitted into the side of the superstructure, being entirely water tight on its inner side and only accessible to water or moisture, if at all, through the cracked lens. Also opposing this opinion, but supporting the testimony of the officers that the light was red at the time of the collision, is the testimony of Worthline, who was in charge of the submarine's engines, that ten days after the steaming the port light showed red and did not show any streaks of white.

After carefully considering the above testimony, I find that the version of the pilot boat is substantially correct; and more specifically find the following facts: The light was freshly painted at Hampton Roads two weeks before the accident. On the way up, by reason of the crack in the lens, water entered and destroyed a large portion of the paint. At the time of the collision, the light showed substantially white, although there were, undoubtedly, streaks and flakes of red paint around its edges. This condition may have been the basis of the very positive testimony of the naval officers as to the red color of the light. In other words, standing close to it, and viewing it from above or from an angle, it may have showed a certain amount of red. However, I find that from the pilot boat it showed white. I accept the testimony of Evans, the lookout, as about correct upon this point. It is a fact, borne out by common observation, that a light or a bulb may have a considerable amount of paint upon it, and yet, if the paint is peeled or flaked off in patches, the light will show white at a distance. Unless the color is strong and solid, the tendency will be to show white, and the farther away the observer stands the less will the color be apparent.

The final finding is that the collision was entirely due to the fault of the submarine, in that its port light was not properly colored and showed white instead of red.

I have not considered in the above discussion the evidence of the respondents which was not strongly contradicted, to the effect that the green starboard light shone across the bow and was visible to the pilot boat as it approached the submarine on its port side. I do not think this had anything to do with the collision. It merely confirmed Bennett's belief that the submarine was showing its starboard side and was a long way off. If he had not seen any green light, he would have proceeded exactly as he was going, and would have been justified in doing so, and the collision would have occurred exactly as it did.

In view of the fact that an affidavit has been filed to the effect that the log book of the pilot boat was in the possession of its Capt. John Kelly, who died two years ago, that search has been made for it, and that it cannot be found, I have not attached any great weight to the fact that it was not produced at the trial This is particularly true, in view of the fact that the libel was not filed for more than two years after the collision.

I find that the arc light on the main mast of the pilot boat which, if lighted, might have obscured its running lights (though I think even this is unlikely), was not lighted at the time of the collision. It was probably turned on immediately afterward, and this fact may easily have been the basis of the testimony of Lieut. Cochran and Commander Luker that it was lighted at the time of the collision.

The findings made as above make it unnecessary to consider whether there was any negligence in the handling of the submarine after she became aware of the close proximity of the pilot boat.

The libel may be dismissed.